UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

TODD R. BLACK,

        Plaintiff,

v.

THOMAS MACKIE et al.

        Defendants.
_____/

Case No. 1:18-cv-653

Honorable Paul L. Maloney

## **OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants Mackie, Ball, Mitchell, and Goodspeed. The Court also will dismiss one part of Plaintiff's Eighth Amendment claim against Defendants Hill, Keeler, and Biddle. The Court will serve the remainder of the complaint against Defendants Hill, Keeler, and Biddle.

**Discussion**

I. Factual allegations

Plaintiff presently is incarcerated with the Michigan Department of Corrections (MDOC) at the Saginaw County Correctional Facility (SRF) in Freeland, Saginaw County, Michigan. The events about which he complains, however, occurred at the Oaks Correctional Facility (ECF) in Manistee, Manistee County, Michigan. Plaintiff sues the following ECF officials: Warden Thomas Mackie; Deputy Warden (unknown) Ball; Sergeant (unknown) Mitchell; Correctional Officers (unknown) Hill, (unknown) Keeler, and (unknown) Biddle; and Hearing Investigator (unknown) Goodspeed.

Plaintiff alleges that, on July 7, 2015, at about 6:10 p.m., he was awaiting his law library callout, which was supposed to begin at 6:15 p.m.. At the last minute, an officer announced that the library computers were down and instructed those inmates who still wished to proceed with the callout to press their emergency response buttons. Plaintiff claims that he pushed his button as instructed "for approximately 8 minutes after 18:10 pm." (Compl., ECF No. 1, PageID.4.) At 6:33 p.m., officers announced that showers were beginning, and the cell doors opened. Plaintiff had to rush to disrobe and grab his shower items, as he was still dressed in his state blues for library callout. As he turned to leave the cell, he saw that the cell door was closing. He ran through the opening, but the cell door closed on him. Plaintiff screamed for help, but Defendant Correctional Officers Hill, Biddle, and Keeler allegedly ignored him, even after he pushed his emergency response button. Plaintiff eventually succeeded in freeing himself from the door, though he came close to passing out, because he could not breathe.

Plaintiff looked at the control bubble. As he did so, he saw Defendants Hill and Keeler turn their backs on him simultaneously, pretending that they did not see Plaintiff being trapped in the cell door and did not hear his screams. Plaintiff walked to the control bubble to ask Defendants Hill, Keeler, and Biddle why they had not released him from the cell door. At the control center, Plaintiff asked to speak with the shift commander, but Defendant Hill denied his request. Defendant Hill then instructed Plaintiff to go back to his cell and lock down. Plaintiff refused, again declaring that he wanted to speak with a sergeant. Defendant Hill told Plaintiff to turn around and to put his hands behind his back for handcuffing. Plaintiff apparently complied with the second order. Defendants Keeler and Biddle escorted Plaintiff to segregation, Plaintiff asked the officers if he could get medical attention, as his chest was hurting and he was asthmatic. Plaintiff does not indicate whether he was given medical attention, and he makes no further allegations concerning his injuries or health. When Plaintiff reached segregation, he explained to Defendant Mitchell what had happened. Defendant Mitchell left, but returned sometime later to explain to Plaintiff that Mitchell had viewed the video and that nothing had happened. At approximately 7:00 p.m. on July 7, 2015, Defendant Hill wrote a Class-II misconduct charge against Plaintiff for disobeying a direct order. When Defendant Mitchell reviewed the misconduct charge, he elevated it to a Class-I misconduct charge and informed Plaintiff that he was confined to segregation.

On July 9, 2015, Defendant Goodspeed interviewed Plaintiff on the misconduct charge. Goodspeed informed Plaintiff that a camera recorded the incident at Plaintiff's cell, but no camera was pointed at the control room during the time Plaintiff was trapped. Plaintiff contends that Defendant Goodspeed did not perform his job adequately. On July 16, 2015, a Class-I

3

misconduct hearing was conducted by Hearing Officer S. Burke. According to Burke's hearing report, Plaintiff admitted that he had refused to obey the order to return to his cell, because staff had assaulted him. Burke reported that she had reviewed the video, which showed that Plaintiff attempted to leave his cell as the door was closing. Burke asked Defendant Goodspeed to investigate whether the doors were malfunctioning at the time, and Goodspeed reported that they were not. Because the doors were not malfunctioning, Burke concluded that Plaintiff was not in any danger if he complied with the order to return to his cell. As a consequence, Burke found that compliance with the order was physically possible. Plaintiff therefore was found guilty of the misconduct charge and sanctioned with five days of detention. (Misconduct Hr'g Report, ECF No. 1-1, PageID.12.) As a result of the misconduct conviction, Plaintiff was reclassified to administrative segregation by the security classification committee. (Security Reclassification Notice, ECF No. 1-1, PageID.13.)

In the interim, on July 8, 2015, Plaintiff filed a grievance, complaining that the second-shift correctional officers, including Defendant Hill, intentionally kept closing the door on him. Defendant Mitchell and Lieutenant Boerema (not a defendant) denied the grievance on August 19, 2015. The grievance response indicated that the video clearly showed the door closing, Plaintiff attempting to leave while the door was closing, and Plaintiff attempting to block the door from closing. (Step-I Grievance Response, ECF No. 1-1, PageID.16, 21.) Plaintiff appealed his grievance to Step II. Defendant Mackie denied the grievance on September 4, 2015, finding that Plaintiff had attempted to leave the cell after the door began to close, thereby failing to exercise due caution for his own safety. (Step-II Grievance Response, ECF No. 1-1, PageID.26.) Plaintiff filed a Step-II grievance appeal, which was denied on March 8, 2016.

Plaintiff alleges that Defendants Hill, Biddle, Keeler, and Mitchell assaulted him, presumably in violation of Plaintiff's rights under the Eighth Amendment. Plaintiff also contends that Defendants Mackie and Goodspeed failed to conduct a proper investigation into the incident, either in the grievance proceedings or the misconduct proceedings.

Plaintiff seeks a variety of injunctive relief. Specifically, seeks to have assault charges brought against Defendants Hill, Biddle, Keeler, and Mitchell. He also seeks to have Defendant Warden Mackie demoted to a correctional officer and to have Defendant Goodspeed fired from his position. Plaintiff also seeks damages in the amount of $5.5 million.

II.     Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court

5

to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A. Defendant Ball

It is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants. *See Twombly*, 550 U.S. at 544 (holding that, in order to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim). Where a person is named as a defendant without an allegation of specific conduct, the complaint is subject to dismissal, even under the liberal construction afforded to *pro se* complaints. *See Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing the plaintiff's claims where the complaint did not allege with any degree of specificity which of the named defendants were personally involved in or responsible for each alleged violation of rights); *Griffin v. Montgomery*, No. 00-3402, 2000 WL 1800569, at *2 (6th Cir. Nov. 30, 2000) (requiring allegations of personal

involvement against each defendant)); *Rodriguez v. Jabe*, No. 90-1010, 1990 WL 82722, at *1 (6th Cir. June 19, 1990) ("Plaintiff's claims against those individuals are without a basis in law as the complaint is totally devoid of allegations as to them which would suggest their involvement in the events leading to his injuries."); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *Krych v. Hvass*, 83 F. App'x 854, 855 (8th Cir. 2003); *Potter v. Clark*, 497 F.2d 1206, 1207 (7th Cir. 1974); *Williams v. Hopkins*, No. 06-14064, 2007 WL 2572406, at *4 (E.D. Mich. Sept. 6, 2007); *McCoy v. McBride*, No. 3:96-cv-227RP, 1996 WL 697937, at *2 (N.D. Ind. Nov. 5, 1996); *Eckford-El v. Toombs*, 760 F. Supp. 1267, 1272-73 (W.D. Mich. 1991). Plaintiff fails to even mention Defendant Ball in the body of his complaint. His allegations fall far short of the minimal pleading standards under Fed. R. Civ. P. 8 (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"). The Court therefore will dismiss Defendant Ball for lack of allegations.

B.  Supervisory Liability – Defendants Mackie & Mitchell

Plaintiff fails to make specific factual allegations against Defendant Mackie, though he suggests that Mackie inadequately or erroneously responded to Plaintiff's Step-II grievance or that Mackie failed to supervise his subordinates. Plaintiff also suggests that Defendant Mitchell mishandled his Step-I grievance and failed to take action against Defendants Hill, Biddle, and Keeler.

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active

7

unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575-76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff has failed to allege that Defendant Mackie engaged in any active unconstitutional behavior. Similarly, Plaintiff fails to allege that Defendant Mitchell engaged in active conduct in denying Plaintiff's Step-I grievance or in supervising Defendants Hill, Biddle, and Keeler. Accordingly, he fails to state a claim against Defendant Mackie entirely and fails to state a claim against Defendant Mitchell based on Mitchell's handling of Plaintiff's grievance and failure to supervise.

C. Due Process – Defendants Goodspeed & Mitchell

Plaintiff complains about the manner in which Defendant Goodspeed investigated the misconduct charge against Plaintiff. He also arguably complains that Defendant Mitchell improperly reviewed Plaintiff on the Step-II misconduct charge and improperly elevated the misconduct charge to a Class-I misconduct.

A prisoner's ability to challenge a prison misconduct conviction depends on whether the convictions implicated any liberty interest. In the seminal case in this area, *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Court prescribed certain minimal procedural safeguards that prison officials must follow before depriving a prisoner of good-time credits on account of alleged

misbehavior. However, the *Wolff* Court did not create a free-floating right to process that attaches to all prison disciplinary proceedings; rather the right to process arises only when the prisoner faces a loss of liberty, in the form of a longer prison sentence caused by forfeiture of good-time credits:

> It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison. But here the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior. Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest." But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

*Wolff*, 418 U.S. at 557 (citations omitted).

Plaintiff does not allege that his major misconduct convictions resulted in any loss of good-time credits, nor could he. The Sixth Circuit has examined Michigan statutory law, as it relates to the creation and forfeiture of disciplinary credits[1] for prisoners convicted of crimes occurring after April 1, 1987. In *Thomas v. Eby*, 481 F.3d 434 (6th Cir. 2007), the court determined that loss of disciplinary credits does not necessarily affect the duration of a prisoner's sentence. Rather, it merely affects parole eligibility, which remains discretionary with the parole board. *Id.* at 440. Building on this ruling, in *Nali v. Ekman*, 355 F. App'x 909 (6th Cir. 2009), the court held that a misconduct citation in the Michigan prison system does not affect a prisoner's

---

[1] For crimes committed after April 1, 1987, Michigan prisoners, like Plaintiff, earn "disciplinary credits" under a statute that abolished the former good-time system. MICH. COMP. LAWS § 800.33(5).

9

constitutionally protected liberty interests, because it does not necessarily affect the length of confinement. 355 F. App'x at 912; *accord, Taylor v. Lantagne*, 418 F. App'x 408, 412 (6th Cir. 2011); *Wilson v. Rapelje*, No. 09-13030, 2010 WL 5491196, at *4 (E.D. Mich. Nov. 24, 2010) (Report & Recommendation) (holding that "plaintiff's disciplinary hearing and major misconduct sanction does not implicate the Fourteenth Amendment Due Process Clause"), *adopted as judgment of court*, 2011 WL 5491196 (Jan. 4, 2011). In the absence of a demonstrated liberty interest, Plaintiff has no due-process claim based on the loss of disciplinary credits. *See Bell v. Anderson*, 301 F. App'x 459, 461-62 (6th Cir. 2008).

Even in the absence of a protectible liberty interest in disciplinary credits, a prisoner may be able to raise a due-process challenge to prison misconduct convictions that result in an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin v. Connor*, 515 U.S. 472, 486-87 (1995). Confinement in administrative segregation "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms*, 459 U.S. 460, 467-73 (1983). Thus, it is considered atypical and significant only in "extreme circumstances." *Joseph v. Curtin,* 410 F. App'x 865, 868 (6th Cir. 2010). Generally, courts will consider the nature and duration of a stay in segregation to determine whether it imposes an "atypical and significant hardship." *Harden–Bey v. Rutter*, 524 F.3d 789, 794 (6th. Cir. 2008). In *Sandin*, the Supreme Court concluded that the segregation at issue in that case (disciplinary segregation for 30 days) did not impose an atypical and significant hardship. *Sandin,* 515 U.S. at 484. Similarly, the Sixth Circuit has held that mere placement in administrative segregation, and placement for a relatively short period of time, do not require the protections of due process. *Rimmer-Bey,* 62 F.3d at 790-91; *see Joseph v. Curtin,* 410 F. App'x 865, 868 (6th Cir. 2010) (61 days in segregation is not atypical and significant). The Sixth Circuit

has also held, in specific circumstances, that confinement in segregation for a relatively long period of time does not implicate a liberty interest. *See, e.g.*, *Baker,* 155 F.3d at 812-23 (two years of segregation while the inmate was investigated for the murder of a prison guard in a riot); *Mackey v. Dyke,* 111 F.3d 460 (6th Cir. 1997) (one year of segregation following convictions for possession of illegal contraband and assault, including a 117-day delay in reclassification due to prison crowding). *But cf. Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (13 years of segregation implicates a liberty interest); *Harden-Bey,* 524 F.3d at 795 (remanding to the district court to consider whether the plaintiff's allegedly "indefinite" period of segregation, *i.e.*, three years without an explanation from prison officials, implicates a liberty interest); *Harris v. Caruso,* 465 F. App'x 481, 484 (6th Cir. 2012) (eight years of segregation implicates a liberty interest). In the instant case, Plaintiff received only five days' disciplinary segregation as a sanction for his refusal to follow orders. His sanction was neither atypical nor significant.

Because Plaintiff was not entitled to due process on his Class-I misconduct charge, any inadequacies the investigation undertaken by Defendant Goodspeed or in the preliminary review of the misconduct conducted by Defendant Mitchell could not have violated Plaintiff's due process rights.

### D. Eighth Amendment – Defendants Hill, Biddle, Keeler, & Mitchell

Plaintiff alleges that Defendants Hill, Biddle, & Keeler deliberately closed the door on him and then failed to reopen the door, despite hearing Plaintiff's screams. Plaintiff alleges that Defendant Mitchell violated the Eighth Amendment, though he does not indicate what action taken by Mitchell violated that right.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it

11

contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). In its prohibition of "cruel and unusual punishments," the Eighth Amendment places restraints on prison officials, directing that they may not use excessive physical force against prisoners and must also "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)). In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

Plaintiff's allegations against Defendant Mitchell are wholly inadequate to state an Eighth Amendment claim. Plaintiff fails to allege any active conduct undertaken by Defendant Mitchell that created a serious risk to Plaintiff or caused him injury, much less that Defendant Mitchell was aware of such risk. Plaintiff alleges only that, after Plaintiff was taken to segregation, Defendant Mitchell did the following: failed to take action against Defendants Hill, Biddle, and Keeler; upgraded Hill's misconduct ticket to a Class-I misconduct; and denied Plaintiff's grievance at Step I. As previously discussed, such allegations do not amount to actionable active conduct. *Iqbal*, 556 U.S. at 676; *Shehee*, 199 F.3d at 300. They most certainly do not demonstrate deliberate indifference to a serious risk to Plaintiff's health or safety.

Plaintiff raises two Eighth Amendment claims against Defendants Hill, Biddle, and Keeler: (1) that Defendants intentionally closed the door on him; and (2) Defendants intentionally ignored his cries for help. The first claim is precluded by the Class-I misconduct finding. In

*Peterson v. Johnson*, 714 F.3d 905, 917 (6th Cir. 2013), the Sixth Circuit held as a matter of first impression that a factual finding made by a Michigan hearing officer in major misconduct proceeding may have a preclusive effect a subsequent challenge under 42 U.S.C. § 1983. Subsequently, in *Roberson v. Torres*, 770 F.3d 398 (6th Cir. 2014), the Sixth Circuit clarified that not every factual finding made in a misconduct proceeding is entitled to preclusive effect. Instead,

> the question of preclusion cannot be resolved categorically, as it turns on case-specific factual questions such as what issues were actually litigated and decided, and whether the party to be precluded had sufficient incentives to litigate those issues and a full and fair opportunity to do so—not just in theory, but in practice. It likewise turns on the court's "sense of justice and equity," . . . which may require a case-by-case analysis of surrounding circumstances.

*Roberson*, 770 F.3d at 404-05 (quoting *Blonder–Tongue Labs., v. Univ. of Ill. Found.*, 402 U.S. 313, 334 (1971) (other citations omitted)). The Sixth Circuit further clarified the limits of the preclusion doctrine in *Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018), as follows:

> To determine whether we must give preclusive effect to "factfinding from Michigan prison hearings," we look to four requirements, all of which must be met: (1) the state agency "act[ed] in a 'judicial capacity'"; (2) the hearing officer "resolved a disputed issue of fact that was properly before it"; (3) the prisoner "had an adequate opportunity to litigate the factual dispute"; and, (4) if these other three requirements are met, we must "give the agency's finding of fact the same preclusive effect it would be given in state courts."

*Id.* at 259 (quoting *Peterson*, 714 F.3d 905, 911-13) (other internal citations and quotations omitted). The *Maben* court further reiterated the holding in *Roberson*: factual findings made by hearing officer in Michigan's Class-I misconduct hearings are entitled to preclusive effect, but only if the hearing officer actually resolved a disputed issue of fact that was properly before him and the prisoner had an adequate opportunity to litigate the factual dispute. The *Maben* court held as follows:

> "*Peterson* is not a blanket blessing on every factual finding in a major-misconduct hearing." [*Roberson*, 770 F.3d at 404.]

13

> Indeed, the question of preclusion cannot be resolved categorically, as it turns on case-specific factual questions such as what issues were actually litigated and decided, and whether the party to be precluded had sufficient incentives to litigate those issues and a full and fair opportunity to do so—not just in theory, but in practice. It likewise turns on the court's sense of justice and equity, which may require a case-by-case analysis of surrounding circumstances.

*Id*. at 404-05 (internal citations and quotation marks omitted). The [*Roberson*] Court declined to decide the preclusion question, and remanded the case to the district court to consider the argument for the first time. *Id*. at 405. The Court instructed the district court to "give particular attention to the fairness and accuracy of the factual findings made by the major-misconduct hearing officer." *Id*. The Court advised that "[n]umerous inquiries may be relevant to the district court's analysis," like "why the hearing officer refused to review the alleged video of the incident, whether the hearing officer provided a sufficient and reasonable basis for her factual findings, and whether the testimony of other witnesses corroborated the accounts provided by either [the prisoner] or [the officer]." *Id*. at 405.

*Maben*, 887 F.3d at 259.

In the instant case, Plaintiff contended at his misconduct hearing that Defendants intentionally closed the cell door on him. The issue was relevant to whether Plaintiff could be found guilty of disobeying a direct order that was valid and reasonable. The hearing officer summarized the evidence considered and then set forth reasons for her decision, as follows:

> I began the hearing by viewing a video outside of prisoner's presence. The video, summarized for prisoner, shows prisoner attempting to step out of his cell door as the cell door is closing. The video is marked as confidential for security purposes. Prisoner present at this video conference hearing. Misconduct Report, Hearing Investigation Report, including statement from the hearing investigator regarding Prisoners Evans, Phetsomphou, Caldwell, Babock, and Beals that the prisoners took statements from the hearing investigator, but did not give the hearing investigator statements, prisoner witness statements (1pg each) of Hall, Pate, Colon, and Gee-El, statement of prisoner (1 pg), offender daily schedule (1 pg), read to and discussed with prisoner. ORAL STATEMENT FROM PRISONER AT HEARING:
>
> Prisoner says that he tried to get out of the cell, but staff assaulted him by closing the doors on him.
>
> I told prisoner I would review the video and make a decision today.

14

> Upon review of the video, it cannot be determined whether the cell doors were malfunctioning. I asked HI Goodspeed to check with the reporter to see if the cell doors were malfunctioning at the time of the incident. Per a phone call to HI Goodspeed, the reporter stated that cell doors were not malfunctioning at the time of the incident.
>
> . . .
>
> PD 03.03.105 defines disobeying a direct order as refusal or failure to follow a valid and reasonable order of an employee. The reporter details that he told prisoner from about five feet away to return to his cell and lock up. Prisoner heard and understood the reporter, as evidenced by his reply, "No. I want a sergeant." Prisoner failed to comply with the order by not locking up. Prisoner admits that the reporter told him to lock up and that he refused to lock up. Prisoner says staff assaulted him with the cell door. However, Prisoner also says that he tried to hurry up and get ready for showers as the cell door was closing. Prisoner chose to squeeze out of the door as it was closing. Per the reporter, the cell door was not malfunctioning, so prisoner's returning to the cell would not endanger prisoner. I find that the order to return to prisoner's cell and lock up was reasonable in that compliance with the order did not create a significant risk of serious harm to prisoner's well-being, the order did not conflict with a prior, but presently effective order given to prisoner, and compliance with the order was physical possible.

(Misconduct Hr'g Report, ECF No. 1-1, PageID.12.)

As reflected in the misconduct hearing report, Plaintiff expressly argued that the correctional officers intentionally closed the door on him, trapping and injuring him. The hearing officer, however, based on all of the facts, concluded that the officers had not intentionally closed the door to trap Plaintiff, but that Plaintiff had attempted to squeeze out of the cell door after it had begun to close, becoming trapped. Indeed, Plaintiff's own statement, on which the hearing officer relied, admitted that Plaintiff "tryed [sic] to hurry up and take my shoes off and grab my towl [sic] and stuff for the showers as the cell doors were shuting [sic] I tryed [sic] to slid-out [sic] before they shut well when I did this the door slamed [sic] on me . . . ." (Prisoner Accused Statement, ECF No. 1-1, PageID.31.) The question of whether the officers intentionally closed the door on Plaintiff was directly litigated at the hearing and the hearing officer expressly found, based on statements and the video, that Plaintiff's entrapment in the cell door was caused by his decision to

try to squeeze out the door while it was closing. As a result, Plaintiff's claim that Defendants Hill, Biddle, and Keeler intentionally closed the cell door on Plaintiff is precluded by finding at the Class-I misconduct hearing. *See Maben*, 887 F.3d at 259; *Roberson*, 770 F.3d at 404.

Moreover, even if his claim regarding the closing of the cell door were not precluded by the misconduct finding, Plaintiff's own complaint admits facts directly contradicting his claim that the officers acted intentionally to close the door on Plaintiff:

> When 18:33 p.m. the officers stated that showers were to bein and I was still dressed in my State Blue for my call out for Law Library. At 18:33 the cell doors opened for showers and I had to strip my State Blues off and grab my shower stuff and when I turned around to go/exit my cell 2-146-B for shower the cell door was closing so I ran between the cell door and the cell door closed on me!

(Compl., ECF No. 1, PageID.4) Plaintiff cannot have it both ways. Officers could not have intentionally closed the doors on him if Plaintiff admits that the doors were already closing before he chose to rush out of his cell in an attempt to beat the closing of the door. As a consequence, by Plaintiff's own factual admissions, Defendants did not intentionally close the door on Plaintiff.

Therefore, both because the claim is barred by preclusion and because Plaintiff admits facts to the contrary, Plaintiff fails to state an Eighth Amendment claim against Defendants Hill, Biddle, and Keeler based on the closing of the cell door.

Plaintiff next alleges that Defendants Hill, Biddle, and Keeler heard his cries for help and his emergency call, but they allowed him to remain painfully trapped in the door for some period, until he could succeed in extricating himself. He also alleges that the officers turned away from him, pretending they had never heard him, supporting his claim that they intentionally extended the time for his suffering. Plaintiff's allegations, if true, are sufficient to state a claim that the officers acted with deliberate indifference to allow Plaintiff to remain trapped in his cell door after they became aware that the door had closed on him. The Court therefore will order

16

service on Defendants Hill, Biddle, and Keeler solely on the claim that they refused to take action to free Plaintiff from his door and thereby extended his suffering.

## **Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants Mackie, Ball, Goodspeed, and Mitchell will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court also will dismiss for failure to state a claim Plaintiff's Eighth Amendment claim against Defendants Hill, Biddle, and Keeler based on the allegation that they intentionally closed the cell door on Plaintiff. The Court will serve the remainder of the complaint on Defendants Hill, Biddle, and Keeler.

An Order consistent with this Opinion will be entered.

Dated: July 9, 2018 /s/ Paul L. Maloney
Paul L. Maloney
United States District Judge