UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TODD R. BLACK,

    Plaintiff,

v.

THOMAS MACKIE, *et al.*,

    Defendants.
_____/

Case No. 1:18-cv-653

Hon. Paul L. Maloney

## REPORT AND RECOMMENDATION

This is a *pro se* civil rights action brought by a prisoner in the custody of the Michigan Department of Corrections (MDOC). This matter is now before the Court on defendants Hill and Keeler's motion for summary judgment (ECF No. 28). Plaintiff did not respond to the motion.

### I.    Background

Plaintiff's complaint involves events which occurred at the Oaks Correctional Facility (ECF). Plaintiff sued seven defendants: Warden Thomas Mackie; Deputy Warden Ball; Sgt. Mitchell; Hearing Investigator Goodspeed; and Correctional Officers (COs) Hill, Keeler, and Biddle. The Court summarized plaintiff's allegations, which are set forth below:

> Plaintiff alleges that, on July 7, 2015, at about 6:10 p.m., he was awaiting his law library callout, which was supposed to begin at 6:15 p.m. At the last minute, an officer announced that the library computers were down and instructed those inmates who still wished to proceed with the callout to press their emergency response buttons. Plaintiff claims that he pushed his button as instructed "for approximately 8 minutes after 18:10 pm." (Compl., ECF No. 1, PageID.4.) At 6:33 p.m., officers announced that showers were beginning, and the cell doors opened. Plaintiff had to rush to disrobe and grab his shower items, as he was still dressed in his state blues for library callout. As he turned to leave the cell, he saw that the cell

1

door was closing. He ran through the opening, but the cell door closed on him. Plaintiff screamed for help, but Defendant Correctional Officers Hill, Biddle, and Keeler allegedly ignored him, even after he pushed his emergency response button. Plaintiff eventually succeeded in freeing himself from the door, though he came close to passing out, because he could not breathe.

Plaintiff looked at the control bubble. As he did so, he saw Defendants Hill and Keeler turn their backs on him simultaneously, pretending that they did not see Plaintiff being trapped in the cell door and did not hear his screams. Plaintiff walked to the control bubble to ask Defendants Hill, Keeler, and Biddle why they had not released him from the cell door. At the control center, Plaintiff asked to speak with the shift commander, but Defendant Hill denied his request. Defendant Hill then instructed Plaintiff to go back to his cell and lock down. Plaintiff refused, again declaring that he wanted to speak with a sergeant. Defendant Hill told Plaintiff to turn around and to put his hands behind his back for handcuffing. Plaintiff apparently complied with the second order. Defendants Keeler and Biddle escorted Plaintiff to segregation, Plaintiff asked the officers if he could get medical attention, as his chest was hurting and he was asthmatic. Plaintiff does not indicate whether he was given medical attention, and he makes no further allegations concerning his injuries or health. When Plaintiff reached segregation, he explained to Defendant Mitchell what had happened. Defendant Mitchell left, but returned sometime later to explain to Plaintiff that Mitchell had viewed the video and that nothing had happened. At approximately 7:00 p.m. on July 7, 2015, Defendant Hill wrote a Class-II misconduct charge against Plaintiff for disobeying a direct order. When Defendant Mitchell reviewed the misconduct charge, he elevated it to a Class-I misconduct charge and informed Plaintiff that he was confined to segregation.

On July 9, 2015, Defendant Goodspeed interviewed Plaintiff on the misconduct charge. Goodspeed informed Plaintiff that a camera recorded the incident at Plaintiff's cell, but no camera was pointed at the control room during the time Plaintiff was trapped. Plaintiff contends that Defendant Goodspeed did not perform his job adequately. On July 16, 2015, a Class-I misconduct hearing was conducted by Hearing Officer S. Burke. According to Burke's hearing report, Plaintiff admitted that he had refused to obey the order to return to his cell, because staff had assaulted him. Burke reported that she had reviewed the video, which showed that Plaintiff attempted to leave his cell as the door was closing. Burke asked Defendant Goodspeed to investigate whether the doors were malfunctioning at the time, and Goodspeed reported that they were not. Because the doors were not malfunctioning, Burke concluded that Plaintiff was not in any danger if he complied with the order to return to his cell. As a consequence, Burke found that compliance with the order was physically possible. Plaintiff therefore was found guilty of the misconduct charge and sanctioned with five days of detention. (Misconduct Hr'g Report, ECF No. 1-1, PageID.12.) As a result of the misconduct conviction, Plaintiff was reclassified to administrative segregation by the security classification committee. (Security Reclassification Notice, ECF No. 1-1, PageID.13.)

2

> In the interim, on July 8, 2015, Plaintiff filed a grievance, complaining that the second-shift correctional officers, including Defendant Hill, intentionally kept closing the door on him. Defendant Mitchell and Lieutenant Boerema (not a defendant) denied the grievance on August 19, 2015. The grievance response indicated that the video clearly showed the door closing, Plaintiff attempting to leave while the door was closing, and Plaintiff attempting to block the door from closing. (Step-I Grievance Response, ECF No. 1-1, PageID.16, 21.) Plaintiff appealed his grievance to Step II. Defendant Mackie denied the grievance on September 4, 2015, finding that Plaintiff had attempted to leave the cell after the door began to close, thereby failing to exercise due caution for his own safety. (Step-II Grievance Response, ECF No. 1-1, PageID.26.) Plaintiff filed a Step-II grievance appeal, which was denied on March 8, 2016.
>
> Plaintiff alleges that Defendants Hill, Biddle, Keeler, and Mitchell assaulted him, presumably in violation of Plaintiff's rights under the Eighth Amendment. Plaintiff also contends that Defendants Mackie and Goodspeed failed to conduct a proper investigation into the incident, either in the grievance proceedings or the misconduct proceedings.

Opinion (ECF No. 4, PageID.56-59). For his relief, plaintiff wants: to have assault charges brought against defendants Hill, Biddle, Keeler, and Mitchell; to have Warden Mackie demoted to a correctional officer; to have Hearing Investigator Goodspeed fired; and to have defendants pay him $5,500,000.00 in damages. *Id.* at PageID.59.

The Court dismissed defendants Mackie, Ball, Goodspeed and Mitchell on initial screening. *Id.* at PageID.71; Order (ECF No. 6, PageID.75). The Court found two possible Eighth Amendment claims against defendants Hill, Biddle, and Keeler: (1) that defendants intentionally closed the door on him; and, (2) that defendants intentionally ignored his cries for help. Opinion at PageID.66. The Court found that plaintiff failed to state a claim with respect to intentionally closing the door on him. *Id.* at PageID.70. However, the Court found that plaintiff did state a cause of action that the three defendants extended his suffering by refusing to free plaintiff:

> Plaintiff next alleges that Defendants Hill, Biddle, and Keeler heard his cries for help and his emergency call, but they allowed him to remain painfully trapped in the door for some period, until he could succeed in extricating himself. He also

3

>  alleges that the officers turned away from him, pretending they had never heard him, supporting his claim that they intentionally extended the time for his suffering. Plaintiff's allegations, if true, are sufficient to state a claim that the officers acted with deliberate indifference to allow Plaintiff to remain trapped in his cell door after they became aware that the door had closed on him. The Court therefore will order service on Defendants Hill, Biddle, and Keeler solely on the claim that they refused to take action to free Plaintiff from his door and thereby extended his suffering.

*Id.* at PageID.70-71. The case proceeded against these three defendants. Biddle was dismissed from the case on June 11, 2019. *See* Stipulation and Order (ECF No. 23). The two remaining defendants, Hill and Keeler, have moved for summary judgment. Plaintiff did not file a response to the motion.

### II.     Motion for summary judgment

### A.     Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

>  (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> 
>  (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

>  The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of

> production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the Court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Plaintiff has not responded to the motion for summary judgment. "The fact that there has been no response to a summary judgment motion does not, of course, mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). The trial court is required to "intelligently and carefully review the legitimacy of such unresponded-to motion" and cannot "blithely accept the conclusions argued in the motion." *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 407 (6th Cir. 1992). However, when a motion for summary judgment is unopposed, "[n]othing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record" to demonstrate the existence of genuine issues of material fact. *Id.* at 405.

### B. Plaintiff's § 1983 claims

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem*,

5

Ohio, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983. Here, plaintiff has alleged that defendants Hill and Keeler violated his Eighth Amendment rights.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. The Supreme Court has held that "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson*, 503 U.S. at 8.

To demonstrate the objective component, the plaintiff must demonstrate that he has been deprived of "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Id.* at 348 (citation omitted). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (quoting *Rhodes*, 452 U.S. at 346). However, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "[R]outine discomfort is part of the penalty that criminal offenders pay for their offenses against society." *Hudson*, 503 U.S. at 9

(internal quotation marks omitted).  As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

**C.  Discussion**

Plaintiff claims that CO Hill and CO Keeler violated his Eighth Amendment rights because they extended his suffering when they refused to free him from the door.  Plaintiff's claim fails because he does not meet the objective component of an Eighth Amendment claim. Defendants supported their motion by filing portions of plaintiff's deposition testimony, their affidavits, and the video of the incident.[1]  In reviewing the video of the incident, defendants point out that plaintiff fabricated relevant portions of both the claims alleged in this case and his deposition testimony.

As an initial matter, defendants point to plaintiff's deposition testimony explaining how the incident started:

---

[1] Defendants' counsel has presented bits and pieces of plaintiff's deposition testimony in non-sequential order.  This incomplete presentation is not helpful to the Court.  However, because plaintiff did not respond to the motion, the Court will accept the quoted portions of the deposition testimony in the context set out by defendants.

7

> . . . I grabbed my shower stuff and turned around the door was starting to close.
>
> Well, me, I slid trying to beat the door. The door slammed on me and I thought I could push it off me, which it was hard to push, and every time when I tried to push the door would slam back on me, and I was cut off of breath.
>
> So I started screaming for help and I started asking the inmates to tell the officers that I'm stuck in the door, which a few inmates has (sic) gone to the officers, said Mr. Black is stuck in the door. Let him out. And then my Bunkie… did the same thing, told him I'm stuck in the door. My neighbor even told the officers, hey, Mr. Black is stuck in the door. Would you let him out? And they still ignored me.
>
> So I started hitting the emergency button and screaming for help, help, help. I'm stuck in the door. Let me out. They still refused to let me out. So I had forced the door. I put my knee and my hand and I forced the door so hard it finally came off me and I slid out.

Plaintiff's Dep. (ECF No. 29-3, PageID.164).

Plaintiff stated that the "middle of his body" got stuck in the door and he had asthma and had trouble breathing while he was stuck. *Id.* at PageID.166, 169.  Plaintiff stated that inmate Hall walked by his cell. *Id.* at PageID.166.  Plaintiff also testified that "at least four other people" saw him stuck in his cell, including people across from him, and "other guys" walking down the hall. *Id.* at PageID.168.  Plaintiff stated that the "middle" of his body was stuck (as opposed to his head or arms) and that "every time when you push it [the door] it slams right back at you," *Id.* at PageID.169.  Plaintiff stated that it took him five times to finally push the door off of him. *Id.* at PageID.171.

Defendants point out that the video does not reflect plaintiff version of events.

> At 18:30:17, or 6:30 p.m., the Plaintiff's cell door begins to close. Just as it's ready to completely close the Plaintiff sticks his knee and his arm in the small opening, to prevent the door from closing. The door stops. (Sealed Facility Video, Ex. A, 18:30:17-18:30:19.) It's quite obvious that the Plaintiff's knee is merely playing door stop, and his chest is nowhere stuck in the door—his upper body is entirely free. (*Id.*) Fourteen seconds later at 18:30:33, you see his upper body move

8

> further back into the cell, because his arm almost goes out of view while his knee continues to prop open the door. The door is just stopped, and it is not continuing to slam into the Plaintiff. Then 24 seconds later the Plaintiff moves his way into the opening he created with his knee. (*Id.* at 18.30:57.) Never in distress and never actually stuck in the door, the Plaintiff puts his hands up on the door, gives it a push open and exits his cell. (*Id.* at 18:31:07-18:31:12.)
>
> The Defendants are not responsible for any unnecessary or wanton pain, first because the Plaintiff acted of his own accord, but most importantly, because there was no pain. (Sealed Facility Video, Ex. A, 18:30:08-18:31:25.) Of course, the Plaintiff was already aware of the fact that he could painlessly prevent the door from closing and squeeze out, because he admitted that he's done that very same thing at other facilities before. (Pl. Dep. Tr., Ex. B-6, 30:1-6.)

Defendants' Brief at PageID.144-145.

In addition, contrary to the allegations in his complaint and his deposition testimony, plaintiff did not enlist other inmates to help him in his time of need or send inmates to ask defendants Hill and Keeler to open the door.

> The Plaintiff tried to allege in his complaint that he sent an inmate to get help, and during his deposition he claimed that four inmates at different times walked by his cell while he was trapped in the door and he sent them all to ask for help, but the officers ignored them. (Pl. Dep. Tr., Ex. B-2, 31:18-25; Ex. B-3, 32:3-13; Ex. B-4, 33:1-25; Ex. B-5, 34:1-6, 16-21.) It only takes 54 seconds to learn that the Plaintiff never talked to anyone and never sent anyone to get help. (Sealed Facility Video, Ex. A, 18:30:19-18:31:13.) Not only did he never send anyone for help, because he did not need help, but not a single person even walked by his cell while he had his knee propping the door open or at any time while he improperly exited his cell. (*Id.*) In fact, most of the Plaintiff's version of this story is completely made up and false. The Plaintiff claimed that he tried five times to push the door off of him and each time it kept slamming back on him as he screamed "help, help help." (Pl. Dep. Tr., Ex. B-8, 36:6-8; B-1, 17:3-19.) Notably, the door never slammed on him at all. By all appearances, once the Plaintiff stuck his knee in the door, the door just stopped until his one attempt to open the door and slide out was successful, and then the door closed. (Sealed Facility Video, Ex. A, 18:30:19-18:31:13.)

*Id.* at PageID.145-146.

Defendants contend that this case should be dismissed in its entirety because the video of the incident contradicts the complaint and the deposition testimony:

9

> Even though there is no sound, after viewing the facility video, a few things are clear. (1) The Plaintiff used his knee to stop the door from closing, not his chest; (2) The Plaintiff's upper body moved freely in and out of the door, it was never stuck in the door, nor was he; (3) The Plaintiff never talked to anyone walking by his cell while he was preventing the door from closing—not one inmate, not four inmates; (4) Not a single person walked by his cell while he had the door propped open, nor was anyone sent by the Plaintiff to get help; (5) The Plaintiff pushed the door open on his first attempt, not his fifth; (6) The Plaintiff never had the door slam on him repeatedly as he struggled to get out of the door while screaming for help, there was no struggle; (7) The Plaintiff was never in any medical distress; (8) The Plaintiff sustained no injuries from this incident and never appeared to have any trouble breathing, or to almost pass out; (9) In order to see up to the control bubble, it appeared that the Plaintiff had to move to the center of the hallway, not because he was stumbling, but perhaps there were obstacles blocking his view of the bubble; (10) From the moment that his cell door initially started to open to the time when the Plaintiff was out of the door, beyond the camera's view and on his way to the control bubble was 1 minute and 17 seconds total. (11) The Plaintiff personally prevented the cell door from closing for 54 seconds, and the Defendants had nothing to do with it.

Defendants' Brief (ECF No. 39, PageID.141). *See* Sealed Facility Video (18:30:08-18:31:25) (ECF No. 31).

Having reviewed the video and other evidence, the Court concludes that plaintiff failed to meet the objective component of an Eighth Amendment claim. There is no evidence: that plaintiff's chest was stuck in the cell door in such a manner as to constitute an emergency; that the door repeatedly slammed against his chest; that he asked at least four inmates to get defendants' attention; or that it took him five attempts to free himself. Plaintiff's claims are blatantly contradicted by the video such that no reasonable jury could believe plaintiff's version of events. Accordingly, this Court should not adopt plaintiff's version of the facts for purposes of ruling on defendants' motion for summary judgment. *See Scott*, 550 U.S. at 380.

The entire incident (*i.e.*, the door closing, plaintiff propping it with his knee, and plaintiff pushing the door out) lasted approximately 55 seconds. The Court does not consider this incident as one which deprived plaintiff of "the minimal civilized measure of life's necessities,"

10

*Rhodes*, 452 U.S. at 347, or which created "conditions intolerable for prison confinement," *id*. at 348.  In reaching this determination, the Court is mindful of the context in which it occurred.  Plaintiff was housed at security level IV, the second highest classification in the State of Michigan.  *See* Defendants' Brief at PageID.139; Keeler Aff. (ECF No. 29-4, PageID.179).  At this security level, the inmate cells are sealed and have automated doors.  Keeler Aff. at PageID.179.  For prisoners like plaintiff, automated doors are a way of life.  As defendants pointed out, plaintiff had experience in preventing such doors from closing on him and squeezing out, because he had done that at other facilities.  In short, there is no basis for plaintiff to claim that defendants extended his suffering by refusing to free him from his cell door.  Accordingly, defendants' motion for summary judgment should be granted.[2]

### III. Recommendation

For these reasons, I respectfully recommend that defendants Hill and Keeler's motion for summary judgment (ECF No. 28) be **GRANTED** and that this action be **TERMINATED**.

Dated:  March 4, 2020                            /s/ Ray Kent
                                                 RAY KENT
                                                 United States Magistrate Judge

---

[2] Defendants are entitled to summary judgment because plaintiff has failed to meet the objective component of his Eighth Amendment claim.  While this is dispositive of plaintiff's case, the Court notes that plaintiff has also failed to meet the subjective component.  To meet this component, the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, must draw that inference, and then must disregard the risk.  *Farmer*, 511 U.S. at 837.  As discussed, there were no facts from which defendants could infer that a substantial risk of harm existed in this case.  Furthermore, both defendant Hill and defendant Keeler submitted unrebutted affidavits that they never saw plaintiff stuck in his cell door.  *See* Hill Aff. (ECF No. 29-5, PageID.185); Keeler Aff. at PageID.180.

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).